# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Kelly L. Stephens  
Clerk

100 EAST FIFTH STREET, ROOM 540  
POTTER STEWART U.S. COURTHOUSE  
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000  
www.ca6.uscourts.gov

Filed: November 26, 2025

Ms. Edith Logan Davis  
Davis & Hoss  
850 Fort Wood Street  
Chattanooga, TN 37403

Ms. Kathryn Clarice McDonald  
Mr. Phillip A. Noblett  
Mr. Andrew Trundle  
City Attorney's Office  
for the City of Chattanooga  
100 E. Eleventh Street, Suite 200  
Chattanooga, TN 37402

Mr. Kyle Sellers McGuire  
Mr. James R. McKoon  
McKoon, Williams, Atchley & Stulce  
633 Chestnut Street, Suite 1500  
Chattanooga, TN 37450-1501

Re: Case No. 24-5688, *Miles Guptill v. City of Chattanooga, TN, et al*  
Originating Case No. 1:22-cv-00011

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely  
Deputy Clerk

cc: Ms. LeAnna Wilson

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0323p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

| | | |
|---|---|---|
| MILES GUPTILL, *Plaintiff-Appellant*, <br><br> v. <br><br> CITY OF CHATTANOOGA, TENNESSEE; OFFICER JOEL GUNN, *Defendants-Appellees*. | ⎫<br>⎬<br>⎭ | No. 24-5688 |

Appeal from the United States District Court
or the Eastern District of Tennessee at Chattanooga.
No. 1:22-cv-00011—Curtis L. Collier, District Judge.

Argued:  March 20, 2025

Decided and Filed:  November 26, 2025

Before: STRANCH, THAPAR, and DAVIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Kyle S. McGuire, MCKOON, WILLIAMS, ATCHLEY & STULCE, PLLC, Chattanooga, Tennessee, for Appellant.  Phillip A. Noblett, CITY OF CHATTANOOGA, Chattanooga, Tennessee, for Appellee City of Chattanooga.  Edith Logan Davis, DAVIS & HOSS, P.C., Chattanooga, Tennessee, for Appellee Joel Gunn.  **ON BRIEF:**  Kyle S. McGuire, James R. McKoon, MCKOON, WILLIAMS, ATCHLEY & STULCE, PLLC, Chattanooga, Tennessee, for Appellant.  Phillip A. Noblett, Kathryn C. McDonald, Andrew S. Trundle, CITY OF CHATTANOOGA, Chattanooga, Tennessee, for Appellee City of Chattanooga.  Edith Logan Davis, Jamie Parks Varnell, DAVIS & HOSS, P.C., Chattanooga, Tennessee, for Appellee Joel Gunn.

DAVIS, J., delivered the opinion of the court in which STRANCH, J., concurred, and THAPAR, J., concurred in part and concurred in the judgment.  THAPAR, J. (pg. 17), delivered a separate concurring opinion.

No. 24-5688            *Guptill v. City of Chattanooga, Tenn., et al.*                    Page 2

---

**OPINION**

---

DAVIS, Circuit Judge.  In 2021, Miles Guptill checked himself into a Tennessee hospital after experiencing mental health symptoms.  As medical staff sought to restrain Guptill to administer a shot, off-duty Police Officer Joel Gunn intervened.  Gunn first twisted Guptill's arm behind his back and then punched his head into a cinderblock wall when Guptill persisted in his refusal of the shot and tried to pull away.  Guptill suffered head trauma from the blow.  He later sued Gunn and the City of Chattanooga for excessive force under 42 U.S.C. § 1983 and multiple state-law torts.  The district court granted Gunn summary judgment on all of Guptill's claims except for common-law assault and battery and granted the City summary judgment in full. Guptill now appeals.  For the reasons below, we AFFIRM.

I.

A. Factual Background

At around 10:00 a.m. on January 11, 2021, Guptill admitted himself into Erlanger Hospital in Chattanooga, Tennessee seeking mental health treatment.  Guptill previously had been diagnosed with schizophrenia, chronic depression, bipolar disorder, and post-traumatic stress disorder.  Guptill presented with delusions and stated that he had been "doing crazy things" like "chasing after his wife" who he believed was unfaithful to him. (Medical R., R. 81-3, PageID 840).  Guptill also described himself as "very manic." (Guptill's Dep., R. 74-1, PageID 472).  But he denied having any suicidal or homicidal ideation.  Medical staff checked him in and placed him in a room used to treat patients under an emergency detention for potential serious mental illness.  They also told Guptill that he could not leave the hospital.

Shortly after Guptill's admittance, Dr. Brian Reuhland ordered a shot of Geodon.  Dr. Reuhland also completed a Certificate of Need ("CON") around the same time.[1]  Guptill's CON

---

[1]A CON permits a medical practitioner to detain a patient for examination and treatment if the patient is mentally ill and poses "an imminent substantial likelihood of serious harm" to themselves or others.  Tenn. Code

documented that he had "a history of schizophrenia" and "now has symptoms of acute psychosis" that "put the patient and others at substantial risk of harm." (Certificate of Need, R. 74-2, PageID 492). Once executed, the CON would place Guptill under emergency detention because of potential serious mental illness and require his admission for emergency diagnosis, evaluation, and treatment. But Dr. Reuhland did not sign the certificate until 2:59 p.m.—which was after the events giving rise to Guptill's claim.

Around 1 p.m., two male nurses tried to administer the Geodon shot. Guptill repeatedly asked staff what the purpose of the medication was. During his interactions with hospital staff, Guptill never raised his voice or threatened anyone. Instead, he pleaded with them not to administer the shot. After explaining that the medication was supposed to help Guptill relax, the staff became increasingly insistent that he accept the shot. So they began to physically restrain Guptill to administer it against his will.

Chattanooga police officer Joel Gunn was moonlighting as a security guard for the hospital and standing outside Guptill's hospital room while the nurses spoke to Guptill. Although Gunn was working as a hospital security guard, on the day of the incident he wore his Chattanooga Police Department ("CPD") police uniform and used a city-issued police vehicle. Gunn also wore a bodycam. He and another security guard monitored the interaction between Guptill and the medical staff from the doorway of the room.

Meanwhile, Guptill continued pleading with the nurses not to administer the shot. As the situation progressed, two male nurses, a second security officer, and Gunn successively entered the room and surrounded Guptill. Each of the men in the room with Guptill—the nurses, the security guard, and Gunn—was noticeably larger than Guptill. Guptill was fifty-seven years old at the time, weighed around 145 pounds, and stood five feet and six inches tall. As the staff closed in on him, Guptill pleaded, "I don't want no shot," to which the medical staff responded, "we have to do it anyway." Two medical staffers held Guptill's arm and lightly restrained him. Then Gunn stepped in and put his hand on Guptill's arm, twisting it sharply behind Guptill's

---

Ann. § 33-6-401. Under such circumstances, a licensed physician must execute the CON for it to be valid. *Id.* § 33-6-426.

back. Guptill repositioned himself by stepping over the bed to provide relief to the shoulder pain caused by his arm being twisted behind his back.

Gunn responded by punching Guptill's head once into the cinderblock wall. After the punch, Guptill stopped moving and said that he would "stop." One nurse immediately urged Gunn to leave the room, saying, "Don't do that. Hey, step out." The nurse repeated the request several times in a strong voice before Gunn left the room. Gunn returned with a notepad, ostensibly to collect information for a report, and began talking with the nurse who had asked him to leave. The nurse expressed frustration with Gunn's actions, stating, "you're only supposed to strike when you're in fear of your life, and we were not, and there were four guys bigger than him in there." The nurse explained that he now had to address the fact that Guptill had "head trauma" because "his head hit a brick wall." He then said to Gunn, "you reacted out of force but we didn't need to. We were in control. We still had him restrained. And you hit a restrained person . . . When I was holding him, you hit him." Gunn countered, "No you didn't, he got out of your restraint."

Following the incident, Guptill spoke with a field supervisor for the City, who in turn submitted an inquiry referral. As a result, the case was assigned to an internal affairs investigator. After reviewing the investigator's report, Captain Nathan Vaughn from CPD, the commander of professional standards, recommended that the allegations of improper application or use of force could be sustained against Gunn. Assistant Chief Glenn Scruggs, the then-deputy chief, also recommended that the allegations could be sustained.

The case proceeded to the Police Advisory Review Committee. Four members recommended Gunn be exonerated because the use of force was within policy. Four members found that the use of force was not within policy. After a disciplinary hearing, Deputy Chief Eric Tucker—acting as Interim Chief—concluded that there was not a preponderance of evidence that Gunn had violated any CPD policy, so the charge was not sustained.

B. **Procedural Background**

Exactly one year after the incident, Guptill filed suit against Gunn and the City. He sued on six counts: (1) Gunn on an excessive force claim; (2) the City for failure to train Gunn; (3) for

failure to supervise Gunn; (4) and for policies, procedures, and customs that caused the constitutional violation; along with (5) a state-law claim for malicious harassment against both the City and Gunn; and (6) a common-law assault and battery claim against Gunn.

At the close of discovery, both Gunn and the City moved for summary judgment. The district court issued two orders. The first order granted in part and denied in part Gunn's motion for summary judgment. The court granted Gunn qualified immunity. But the court denied summary judgment on Guptill's claim for assault and battery because it found a genuine issue of material fact as to whether Gunn used excessive force. The court's second order granted the City's motion for summary judgment in full. In doing so, the district court declined to exercise supplemental jurisdiction over the remaining state-law claim against the City for malicious harassment, dismissing it without prejudice.

Guptill moved to alter or amend, which the district court denied. He then timely appealed.

## II.

### A. Standard of Review

We review a district court's summary judgment ruling de novo, construing the facts in the light most favorable to the non-moving party. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Summary judgment is proper when no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The central issue is whether the evidence presents a sufficient disagreement to require submission of Guptill's claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See id.* at 251–52.

When the movant establishes the lack of a genuine issue of material fact, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ.

P. 56(e)). The court must view all evidence and make all inferences in the light most favorable to Guptill as the non-moving party. *Fisher*, 951 F.3d at 416. But where videos in the record "show facts so clearly that a reasonable jury could view those facts in only one way," we must view the facts in the light depicted by the videos. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). If the facts shown in the videos can be interpreted multiple ways, the facts should be interpreted in the light most favorable to the nonmoving party. *Id.*

**B. Qualified Immunity**

Gunn argues that he is entitled to qualified immunity on Guptill's § 1983 excessive force claim. Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a defendant has asserted qualified immunity, then the plaintiff bears the burden of overcoming it by showing that (1) the defendant "violated a federal statutory or constitutional right," and (2) "the unlawfulness of [the defendant's] conduct was clearly established at the time." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citation omitted). We may consider these requirements in the order of our choosing. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A right is clearly established when every reasonable official would have understood that what he is doing violates that right." *Reed v. Campbell Cnty.*, 80 F.4th 734, 742 (6th Cir. 2023) (citation modified).

1. Constitutional Violation

The Fourth Amendment protects individuals from unreasonable seizures, which includes those involving excessive force by law enforcement officers. *See Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022). In analyzing a claim of excessive force, we ask "whether the officer's actions were 'objectively reasonable in light of the facts and circumstances confronting them.'" *Id.* (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)). This test considers the "totality of the circumstances" surrounding the use of force and looks only to the facts the defendant officer knew at the time. *Id.* (citation omitted). "The use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Supreme Court in *Graham* provided the analytical guideposts for traditional Fourth Amendment excessive force cases: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396 (citation modified). *Graham* is an imperfect fit here, since Guptill did not commit a crime, resist arrest, or try to flee. When the *Graham* factors "do not easily map onto" a given case, we consider other factors. *Palma*, 27 F.4th at 429.

In cases involving mental health or medical emergencies, we factor in other considerations like: (1) whether it was a "medical emergency that rendered [the person] incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others"; (2) whether "some degree of force [was] reasonably necessary to ameliorate the immediate threat"; and (3) whether "the force used [was] more than reasonably necessary under the circumstances (i.e., was it excessive)." *Estate of Hill*, 853 F.3d at 314. "Like the *Graham* factors," this list is not exhaustive and "not necessarily dispositive in every case." *Id.* Rather, these factors guide us as we consider the totality of the circumstances. *Id.*

    a.  Medical Emergency

Guptill maintains that he was not experiencing a medical emergency. He points out that the CON had not yet been signed, and he was calmly and politely discussing his treatment with the medical providers, after driving himself to the hospital for treatment. He says nothing in the video that gave the impression that he was incapable of making a rational decision under the circumstances. He distinguishes the medical emergency in *Estate of Hill*, in which Hill (1) was experiencing a diabetic emergency that risked seizure or death if left untreated; (2) became combative, resisting life-saving treatment; and (3) was experiencing blood spraying everywhere, which posed a safety risk to the officer and paramedics. 853 F.3d at 314–15. And Guptill asserts that his actions were unlike the plaintiff in *Caie v. West Bloomfield Township*, who was depressed, intoxicated, suicidal, and submerged chest-deep in a lake when officers arrived. 485 F. App'x 92, 93 (6th Cir. 2012). Guptill says the record does not support that he posed an immediate threat to himself or others. For his part, Gunn relies on the district court's

characterization of events. Based on Guptill's physical resistance, repeated questions, and the fact that he was under emergency detention, the district court concluded that a reasonable officer could believe that Guptill was experiencing a medical emergency.

The record lends credence to both parties' perceptions of events. True, Guptill was not swinging his fists, as in *Estate of Hill*. 853 F.3d at 314. But, as the district court noted, it was not objectively unreasonable for Gunn to perceive a medical emergency. After all, Guptill sought medical intervention to begin with because he had been experiencing delusions and "doing crazy things[.]" (Medical R., R. 81-3, PageID 840). And the medical professionals who assessed his condition promptly concluded that emergency detention was appropriate. Under the circumstances, it was not unreasonable to question the rationality of Guptill's decision to refuse medication that was supposed to help him regain mental stability.

### b. Any Force Necessary

We next ask whether some degree of force was reasonably necessary to ameliorate an immediate threat. *Id.* Guptill insists that there was no evidence of an immediate threat because he was calm, polite, and noncombative. He emphasizes that expert witness and former police officer Jeffrey Pike, who reviewed the bodycam footage, concluded that Guptill's physical actions and verbal communications were defensive in nature. And he notes that various officials in the City's investigative chain of command found that Gunn's use of force could be considered excessive under the City's policy. All of this, taken together with the bodycam footage, creates a factual dispute as to whether some degree of force was reasonably necessary, Guptill says.

When an individual experiencing a medical emergency actively resists being held under control by medical staff or law enforcement, some level of force may be reasonably necessary to ameliorate an immediate threat. *See id.* at 315 (finding that some force was reasonably necessary when a patient "violently resist[ed] the paramedics' attempts to render him life-saving assistance" and "paramedics were unable to gain physical control over [him]"); *see also Caie*, 485 F. App'x at 97 (permitting some force where a plaintiff was "uncooperative by actively resisting the officers' attempts to secure his arms behind his back"). "Active resistance includes

'physically struggling with, threatening, or disobeying officers.'" *Kelly v. Sines*, 647 F. App'x 572, 575 (6th Cir. 2016) (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)).

As medical staff tried to administer medicine to him, Guptill became increasingly distressed and resistant. He repeatedly indicated that he did not want the medicine. In response, medical staff gripped Guptill's arm, and Gunn then twisted Guptill's arm behind his back. Guptill admits that he pulled away to try to relieve the painful position of his arm. He was physically struggling with Gunn in that moment. Guptill was not "violently" resisting like Hill, and his verbal protests were largely respectful (though increasingly pleading with medical staff). *Estate of Hill*, 853 F.3d at 315. Further, in context, his actions posed little danger to medical staff and security; Guptill was substantially smaller than the men who surrounded him, he donned a paper hospital gown, and he made no physically threatening move toward anyone in the room. Still, a reasonable officer could have believed that the nurses were struggling to gain control over an emergent situation and that Guptill's refusal of the medication posed a modest threat to his own safety or the safety of others. After all, Gunn had observed medical staff (1) telling Guptill he "had" to take the medication, and (2) attempting to restrain him in order to administer the shot. Gunn was also aware that Guptill was assigned to a treatment room that the hospital typically designated for patients with CONs. Even viewing the facts in the light most favorable to Guptill, no reasonable juror could find Gunn objectively unreasonable in believing that some degree of force was necessary to help medical staff restrain Guptill to administer the medication—which would then ameliorate the immediate threat.

  c. *Degree of Force*

Finally, we consider whether the amount of force Gunn used—punching Guptill's head into the cinderblock wall—was more than reasonably necessary. *See Estate of Hill*, 853 F.3d at 314. Guptill says that Gunn's punch was deadly force, which was excessive under the circumstances. He emphasizes that Gunn knew that his head was mere inches from a cinderblock wall and that the force of the punch would cause his head to collide with the wall. Moreover, says Guptill, the fact that Gunn was a much larger individual than Guptill created the type of force that could have proved fatal. And even if Gunn's punch was not deadly force, it was still excessive, considering that Guptill posed no immediate threat of serious harm.

Gunn argues that he needed to use force to gain "compliance and control over" Guptill so that he would cooperate with medical staff and not "assault them further." (Mem. in Supp. of Mot. for Summ. J., R. 74, PageID 456). And Gunn contends that he exercised restraint in using only a single punch to the side of Guptill's head and face after Guptill pulled away. (*Id.*).

The last step of the *Estate of Hill* analysis is also fact-specific. *See id.* at 315. One useful question is whether Gunn could have used less violent means to sufficiently restrain Guptill. *Id.* (justifying the use of a taser when "four paramedics were unable to physically restrain [the plaintiff], whose health was rapidly deteriorating"). When considering physical resistance by a mentally ill person and the amount of force an officer uses to restrain them, we must account for "[t]he diminished capacity of an unarmed detainee" and the fact that they may be "emotionally disturbed." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) (citation omitted). When an unarmed detainee is mentally unstable, officers are required to "de-escalate the situation and adjust the application of force downward." *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013) (citing *Champion*, 380 F.3d at 904). And "[w]hether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases," though not "conclusive proof that the Constitution has been violated." *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015).

Guptill has raised a genuine dispute of material fact on whether Gunn's use of force was more than reasonably necessary under the circumstances. While it was objectively reasonable to believe some degree of force was necessary to help medical staff restrain Guptill, a reasonable juror could conclude that punching Guptill's head into the wall was not reasonable under the circumstances. Consider the severity of the threat Gunn reasonably perceived. Guptill was experiencing a mental health crisis, was in the process of being placed under emergency detention, was in the detention-designated room, and presented as delusional and manic. Add to those facts that Guptill physically resisted treatment when medical staff told him he had to take the medication, and medical staff resorted to attempts to restrain him. That said, Guptill's resistance was mainly in the form of refusing to give his arm and pulling away as medical staff and Gunn tried to grab his arms. His resistance was not violent, and his verbal responses to Gunn and medical staff were largely polite and respectful, using words like "please" and "Sir"

even as he was becoming increasingly distressed. Notably, no medical staff asked Gunn to intervene; instead, he "assumed that they would want me there." (Gunn's Dep., R. 74-1, PageID 515). Gunn watched medical staff agree with Guptill as he calmly stated that he was not being combative. As discussed above, the threat—even if imminent—was modest. And at least two of the staffers had a firm grip on Guptill while a nurse was attempting to put the needle in Guptill's arm. It was at that moment that Gunn intervened, uninvited, and twisted Guptill's arm behind his back. Guptill responded by pulling away and stepping over the bed to relieve his shoulder pain. Gunn then punched Guptill's head into the wall.

The punch was forceful. When Gunn punched Guptill, he still controlled one of Guptill's hands, and other medical staffers held parts of Guptill's body and clothing. Guptill's ability to move was greatly restricted; he was surrounded in a very small room. The medical staffers did not perceive striking Guptill in the side of the head and face as necessary to assist them in restraining Guptill for the shot. A nurse immediately and urgently demanded that Gunn stop and leave the room. And one of the nurses in the room later said to Gunn, "We were still in control. We still had him restrained. And you hit a restrained person." Thus, others who were in the room with Gunn, trying to restrain Guptill for his medication, did not perceive a threat sufficient to warrant a hard strike to the head into a cinderblock wall. And considering the totality of the circumstances, Gunn could have used less violent means to restrain Guptill. *Cf. Estate of Hill*, 853 F.3d at 315.

"Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases." *Mullins*, 805 F.3d at 768. But a violation of department policy is not per se evidence of a constitutional violation. *Id.* Here, CPD policy dictates that "[u]nder no circumstances shall the force used be greater than necessary to achieve lawful objectives." (CPD Policy Manual, R. 74-8, PageID 613). The recommendations of the then-commander of professional standards, the then-deputy chief, and half of the members of the review committee are relevant to our analysis, although they did not ultimately result in a sustained charge against Gunn.

Guptill's invocation of CPD's policy is persuasive but not dispositive. For instance, he disputes that his stepping over the bed to relieve his shoulder pain was definitively "defensive

resistance" justifying a "hard empty hand technique[]" like punching under CPD policy. (*Id.* at 611–12). The bodycam video does not blatantly undermine Guptill's assertion that he sought to reposition himself to ease the pain inflicted on him rather than to prevent Gunn's control. From these facts, a reasonable juror could conclude that the force Gunn used did not comply with CPD policy. In sum, while it was objectively reasonable for Gunn to believe some force was necessary, a reasonable juror could conclude that Gunn punching Guptill's head into the wall was more force than reasonably necessary under the circumstances. *Estate of Hill*, 853 F.3d at 314.

Considering the totality of circumstances in the context of a medical emergency, a reasonable juror could conclude that Gunn's punch was excessive and violated constitutional standards. Guptill has therefore satisfied the first prong of the qualified immunity analysis. We continue to the second prong, where his claim falters.

   2. Clearly Established Law

"A right is clearly established when every reasonable official would have understood that what he is doing violates that right." *Reed*, 80 F.4th at 742 (citation modified). "Though a plaintiff need not point to a case on all fours with the instant fact pattern to form the basis of a clearly established right, there must be a sufficiently analogous case (or cases) from which a reasonable official would understand that what he is doing violates that right." *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023) (citation modified). And the "existing precedent must have placed the statutory or constitutional question [which the plaintiff asserts] beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted).

The goal is to ensure officers have a fair and clear warning that certain conduct violates the law. *Kisela v. Hughes*, 584 U.S. 100, 105 (2018). In assessing whether a right is clearly established, "we look first to decisions of the Supreme Court, then to our own precedents, and then to decisions of other courts of appeal" in limited circumstances not present here. *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). Out-of-circuit decisions only clearly establish the law in "extraordinary cases where [they] both point *unmistakably* to a holding and are *so clearly* foreshadowed by applicable direct authority as to leave no doubt regarding that holding." *Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) (citation modified). When an officer's

Case: 24-5688   Document: 32-2   Filed: 11/26/2025   Page: 13   (15 of 20)

No. 24-5688         Guptill v. City of Chattanooga, Tenn., et al.              Page 13

actions fall "in the hazy border between excessive and acceptable force," then the right is not clearly established. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (citation omitted). But where actions are so obviously contradicted by the law, then officers may have notice that their conduct violates clearly established law "even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that officials' conduct—using a hitching post to punish Hope—inflicted unnecessary and wanton pain, in violation of Supreme Court precedent giving respondents fair warning that such conduct clearly violated the Eighth Amendment).

Our precedent on excessive force in the medical emergency context is limited. But, in other contexts, we have "clearly establish[ed] the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Meadows v. City of Walker*, 46 F.4th 416, 423 (6th Cir. 2022) (citation omitted). This is true whenever a reasonable jury could conclude that the person subject to the force was complying with the officers' commands. *Id.*

In *Martin*, we found that "a reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force." 712 F.3d at 963. We reasoned that "Martin did not present a serious safety risk that justified the officers' use of force," even if he "struggled to avoid being handcuffed." *Id.* at 962.

We have also clearly established that when an officer strikes someone in the head with a nightstick from behind, unprovoked, "without cause and without warning," and seriously injures him, that is excessive force. *Dugan v. Brooks*, 818 F.2d 513, 517 (6th Cir. 1987). And a sister circuit has held that "even a 'single punch' may constitute excessive force when an officer uses that force on someone who no longer 'pose[s] a danger' to anyone." *Jones v. Ceinski*, 136 F.4th 1057, 1065 (11th Cir. 2025) (citation omitted). These cases, however, do not fully capture the contours of the right Guptill asserts, and *Jones* is nonbinding in any event.

Here, the right at issue is whether a person who is experiencing a mental health emergency and physically resisting treatment in a non-threatening manner has the clearly established right not to be punched by a law enforcement officer. Guptill frames the issue as: a

medical patient's "right to be free from an unjustified punch to the head by a police officer" especially when officers "have no reasonable belief that their victim is a threat." (ECF 16, Appellant Br., 24). Regardless of this difference in framing, in support, he cites only to state and unpublished cases, which we cannot rely on to determine whether a right is clearly established. *See Bell v. City of Southfield, Michigan*, 37 F.4th 362, 367 (6th Cir. 2022).

Even viewing the facts in Guptill's favor, he has not identified a violation of a clearly established right. No binding caselaw Guptill identified or that we could find has determined that an officer responding to a perceived medical emergency and a partially restrained patient who is passively resisting medication cannot use a single punch to enforce compliance when that individual pulls away from the officer, "even if the officer was not entirely sure" about the resistance. *See Meadows*, 46 F.4th at 424. Thus, Guptill cannot prevail on the clearly-established-law prong of qualified immunity.

### C. *Monell* Liability

Guptill also challenges the district court's dismissal of his *Monell* claim against the City. He argues that the City ratified Gunn's actions when, after an internal investigation of Gunn's actions, its Interim Chief of Police Eric Tucker found that the charge against Gunn was "not sustained." (Final Disposition, R. 81-12, PageID 978–79). Guptill says that Tucker held the final authority for the City regarding Gunn's actions. So the City's decision not to sustain the charge was a ratification of Gunn's unconstitutional use of excessive force. Guptill's *Monell* claim fails because he does not establish that Chief Tucker was the final policymaker for the City or that Tucker's actions were the moving force behind Guptill's injury.

A municipality cannot "be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Rather, Guptill must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citation omitted). Guptill can do so by showing that the municipality had a "policy or custom" that caused the violation of his rights. *Monell*, 436 U.S. at 694. There are four ways a plaintiff can

No. 24-5688           *Guptill v. City of Chattanooga, Tenn., et al.*           Page 15

establish that a municipality's policy or custom caused a constitutional violation. He may show "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citation omitted). Guptill asserts the second theory.

"[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances"—for example, a single decision by a city council. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). But the policymaker must have "final authority to establish municipal policy with respect to the action ordered," which is a question of state law. *Id.* at 482–83. A municipality can also be held liable for a subordinate's decision if the final policymaker ratifies a subordinate's decision, making it final. *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)). But "on a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.'" *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (quoting *Pembaur*, 475 U.S. at 483). The policymaker's "action must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.*

Not all decisions qualify. "Mere authority to exercise discretion while performing particular functions[,]" like resolving an internal investigation, "does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano*, 988 F.2d at 655. Guptill has only shown that Tucker was the decisionmaker responsible for the final determination of whether the charge in the internal investigation was or was not sustained. This single act fell within his discretionary authority. *See id.* But it is not enough to establish municipal liability based on ratification. *See Burgess*, 735 F.3d at 479.

Indeed, Guptill does not even argue that Tucker's ratification was the moving force behind Gunn's actions. He neither asserts nor shows that Tucker authorized Gunn's conduct in

the hospital.  Instead, the alleged ratification happened after the fact—when Tucker concluded that the internal charge against Gunn was not sustained.  But "single-act" scenarios that point to a policymaker's "*post hoc*" actions following an act of alleged malfeasance are not typically enough to show that the policymaker was the moving force behind a plaintiff's injury.  *Burgess*, 735 F.3d at 479.  And here, Tucker's review of Gunn's behavior came nearly eight months after the incident.  So, this "after-the-fact approval" of Gunn's actions cannot serve as the moving force behind Guptill's harm.  *Id.*  "Such an outcome would effectively make [the City] liable on the basis of *respondeat superior*, which is specifically prohibited by *Monell*."  *Id.*  Guptill, therefore, has not demonstrated a genuine issue of material fact for municipal liability, and judgment in the City's favor was appropriate.

### III.

For these reasons, we AFFIRM.

No. 24-5688       Guptill v. City of Chattanooga, Tenn., et al.       Page 17

---

**CONCURRENCE**

---

THAPAR, Circuit Judge, concurring in part and concurring in the judgment. I join the majority's thoughtful opinion with one observation. The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *District of Columbia v. Wesby*, 583 U.S. 48, 66 n.8 (2018). Rather, it has repeatedly reserved that question. *See, e.g., id.*; *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam); *Reichle v. Howards*, 566 U.S. 658, 665–66 (2012).

If the Supreme Court isn't sure, how can an officer be? *See Brown v. Giles*, 95 F.4th 436, 439 n.1 (6th Cir. 2024). It's easy for us to say officers should know what Sixth Circuit precedent prohibits—and how to correctly apply that precedent in a rapidly unfolding emergency. After all, we aren't the ones risking our lives in the line of duty. Unlike us, "law enforcement officers must protect the public in an uncertain and dangerous world, not the cold crucible of the courtroom." *Rudolph v. Babinec*, 939 F.3d 742, 755 (6th Cir. 2019) (Thapar, J., concurring in part and dissenting in part). It's even worse to suggest that officers must pore over not only our cases, but also those from our eleven sister circuits. To the extent our case law suggests they must do so, it's incorrect. While the majority references this case law, it doesn't rely upon it, so I concur.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5688

MILES GUPTILL,

    Plaintiff - Appellant,

v.

CITY OF CHATTANOOGA, TENNESSEE; OFFICER JOEL GUNN,

    Defendants - Appellees.

> FILED
> Nov 26, 2025
> KELLY L. STEPHENS, Clerk

Before: STRANCH, THAPAR, and DAVIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

ENTERED BY ORDER OF THE COURT

*Kelly L. Stephens*

Kelly L. Stephens, Clerk